May it please the Court, Mark Rosenbusch appearing for Stephen Ray Henderson. I'm accompanied at the council table by my associate Timothy Finnegan. Your Honors, what I'd like to do, this was an extensively brief case and it was a long record. I think what I would like to do is address what I believe is a matter of first impression and an issue that is in effect I think is positive of the case. And that is the issue of facial insufficiency of the wiretap orders. The reason I say I think it's a matter of first impression is because I think that what's at issue is whether three or whether they can be completely disregarded. The context of that is that wiretapping is an extraordinary invasion of privacy. And that's not only of named targets, and that's with respect to the non-criminal parts of their conversations, but the unnamed persons whose communications are inevitably monitored as well. In 1968, Congress debated not only what restrictions should be placed on this kind of surveillance, but whether it should be permitted at all in anything other than national security situations. Now, Congress decided to prevent this kind of surveillance, but only under strict conditions, and all of them were specifically laid out in the statute. The procedural safeguards here are mandatory. They're more restrictive than in cases of searches controlled by the Fourth Amendment. Suppression here is a statutory remedy. Well, you say procedural requirements. I think if we read the district court's order, the judge's order, he seems to say that the procedures were complied with. It didn't appear that what wasn't complied with is necessarily that these things appeared on the face of the application or on the face of the order, but the actual substance of what happened was complied with. Those are the findings. I'm sorry. When you say procedures, I think what you're arguing is that if it's not on the face of the order, it doesn't exist. If it's not on the face of the application, it doesn't exist, and we don't look beyond that. Is that what you're saying? Yes, and certainly with respect to core requirements of the statutory procedure, and I think we're clearly dealing with core requirements. Yeah, we're dealing with authorization. Yes. Which is a core requirement. I don't think there's any reason to argue that point. I think that... If there were an authorization, that would be a... if there had, in fact, been an authorization, that would be a... that's a defect, but you wouldn't have to argue anything else. Yes, or if the authorization had not been received and proved to the court prior to the application, which is a separate argument that we're making with respect to... Right, so even though there's no... I'm sorry. Right, if the court didn't see it, even if it existed, that's another... that's a defect, but I think what the findings here are is that so the underlying things did happen, authorizations were received, they did exist, but the papers don't reflect that, and that's why we have a venture hearing. Yes. Are you arguing that you can't have an adventure hearing if the papers don't reflect that that's it? I'm arguing that Judge Jensen's finding that this was merely a clerical error, that the required statements in the application and findings in the order were not there, it was merely a clerical error, is clearly wrong. I don't think that is even a finding of fact. I think, in fact, it's really a decision of law, because if you take a look at the statute itself, they are, in plain language, required. Under 2518-1A, that section specifically requires that the application include the identity of the law enforcement officer making the application and shall specify, that's the language, in the application the name of the responsible DOJ official authorizing the application. 2518-4D requires that the order, rather than the application. I'm sorry, it says identity. 2518-1A? Yes. Where's the same name? I'm taking identity to be name. The identity and... Oh, okay. That's what I'm reading. But they're not the same. Well... I mean, if I said, you know, the lawyer that was in the courtroom and argued the case on behalf of Henderson and had a beard and, you know, I could describe you in many ways that wouldn't use your name. Right. The policy behind this requirement was to fix responsibility on an individual, and that's discussed in the Giordano case, in the Chavez case, in the Crate case, in Reyna. The purpose here was to fix responsibility at a level individual in DOJ who was politically responsible. Wasn't it taken care of by the letters being found in either the clerk's file or the district court file? Well, the statutory scheme requires not that there simply be a letter of authorization by an appropriate level person, but that that person be identified in the application and the order. I realize it says shall in what Congress says, but having the court said, well, shall really doesn't mean shall as far as suppression is concerned. If it doesn't directly implicate the Congress's intent, then it's okay, even though they didn't exactly follow the rules. Well, I think on one level a distinction between judicially created rules and statutorily created rules... Wasn't Chavez a rule that's kind of an exception to the rule? Well, I think Giordano and Chavez have made it clear that core requirements must be satisfied. In other words, there may be certain statutory requirements within 2518... One case talks about core requirements. I've never heard about core requirements in the cases I've read. Giordano. Giordano specifically says core... okay. The exact language may not have been core requirements, Your Honor. I think it was central... I forget the exact wording. I'm paraphrasing it as core requirements of the statute. And what they said in Giordano, that this authorization process by DOJ is one of those core requirements. For that reason, they're not nearly clerical as the district court characterized them. We've got another word here, though, that you have to deal with, and that is the word include. And you already include as meaning it shall be in the text of the application. Whereas without too much stretching, you could say include... for example, if it said that, but didn't say anything else, and the letter were, in fact, stapled to it and attached, that would surely be included. Well, that's where there are black and white situations and then there are shades of gray. The situation... But that's not really a shade of gray because there's nothing where the word includes that necessarily means it has to be somewhere between the caption and the signature line. There was no incorporation by reference in any of these documents either. What if the letter... there's an application and the assistant walks in the application and hands it to the judge along with the letter saying here's my authorization? That's not included? That is not included by the requirements of the statute because the statute says that the identification of the official has to be included in the application and in the order. In the situations in Giordano, Chavez, Trace, they say, you know what? All of them involved applications and orders that, in fact, named the person involved. Now, in some cases, the person wasn't named in the order, but in those cases, the person was named in the affidavit or application requesting the order. Well, it says each application should include the following information. Yes. It doesn't say either in or with. It just says should include. Well, not only the application but the order. 2518-4D requires that the order must identify the agency authorized to intercept the communications and the person authorized in the application. Would it be a fair statement that a basic premise of your argument is that we have to find that Judge Jensen was clearly in error in many of the factual findings he made on all of these three applications and each of the applications? Yes, that's fair, and we believe that he was clearly in error, and we've made the specific factual arguments in our briefing. Here, I think that he was clearly wrong characterizing the failure of the application and order to even refer in any way to authorization by DOJ as a clerical error. The statutory scheme makes it clear that it's not. For example, because Giordano has called this what I'm characterizing a core requirement of the statute, one of those safeguards that was important to the statutory scheme, it's the same as a court making a finding of necessity or probable cause, a court not making such findings in the order. In other words, another core requirement is necessity before a wiretap order can be issued. Another one is a finding of probable cause. This is the same as if the court had not made one of those findings. Can the court then say, oh, well, it existed anyway? The statute requires that a court make those findings. It requires that the basis for the findings be in the application. Here, it's political accountability that's the core issue, and there can't be any political accountability unless there is designation of the specific individual responsible within the Department of Justice for authorization. Why isn't there accountability if it's in the letter? Anybody go look at the letter? It's in the file, in the clerk's file, and say, gee, this is the guy that blew it. Why isn't there accountability? Well, first, because access to the file is not that easy, and secondly, because... Really? Yes. To the public. Let me characterize it this way. The fact of this case, I think, Your Honor, established that even Judge Breyer never knew who the politically responsible person within the Department of Justice who authorized these applications was. And I say that because in the required annual reports to the administrative office of the courts, Judge Breyer, who signed these orders, reported that the person who authorized the applications was AUSA Jeff Cole, who is, of course, not a person in DOJ at all, and not a person who is designated or permitted to make these authorizations. That's the problem that we've got here. If the court is not required to do what Rana says the court has to do, which is not take law enforcement officials who apply for this kind of surveillance at their word, but make sure that each required step of the statute is fulfilled, then we have a problem. Here the statute says the way that that's done with respect to assigning, to being sure that an appropriate level official authorized the wiretap, is it is required that that person be designated in the application, and it is required that the court make a finding in its order. And neither of those things are here. Is there an argument... Go ahead, sir. I hear you going back and forth between two arguments. I'm having trouble figuring out which one you mean. Maybe you mean both. One of them is that, look, it's not on the face of the order. That's the end of it. And it doesn't matter what Judge Jetson found. He might have been right 100% in everything he found. It doesn't matter. It's not on the face of the order. That's one argument. The other argument, which you made a response to Desrosiers' question, where he said, wouldn't we have to find that Judge Jetson was wrong in his finding, and he said yes. So that sounds to me like an argument that the findings are not supported by substantial evidence, which is a difficult burden for you to carry, but maybe you can carry it. If you're making the first argument, then the answer to Judge Rose should have been no. You don't have to find that Judge Jetson is wrong. All you have to find is it's not on the face of the orders. It doesn't matter what Judge Jetson found. So I'm still trying to figure out what it is you're really arguing. I think they're both true. I think that if it's not on the face of the order. So the answer to Judge Rose, I mean, I don't know what kind of argument, but I would have thought you'd say no, you don't have to find that Judge Jetson is wrong. You could agree with everything Judge Jetson said and still rule that this was defective because it wasn't on the face of the order, it wasn't on the face of the application. Well, no, I don't think so because I think Judge Jetson was wrong by ruling that these, that there was no requirement in the application and the order. I think Judge Rose, I don't remember a very clear answer to the question, but the answer to the question was do we have to find that Judge Jetson earned in his factual findings. Obviously you're not agreeing with his legal ruling or he wouldn't be here. Again, I'm just trying to understand what your argument is. If you're arguing that it has to be on the face of the order, on the face of the application, then it doesn't really matter what any of the other stuff was. Is that? That's true, and I am arguing that. You are arguing, okay. And I'm also arguing that if it doesn't matter, Judge Jetson is wrong. Yes. Okay, fair enough. And I wanted to, there's a distinction that I think is important to make because I think that the government did not make it in their brief, and that is the government's argument that the first two applications were, in fact, approved by a designated DOJ official is the answer to the problem here. I think it's not. That's off the mark because, that's off the mark with respect to our facial insufficiency argument because we can see there were letters in the file of authorization from a deputy assistant attorney general with respect to the August and September wiretaps. The question here is not suppression under 251810A1, which is the section that permits suppression when a communication was unlawfully intercepted. Because of a 25161 failure to secure authorization. We are making that argument with respect to the September and October applications as a separate argument. But here, the argument is under 251810A2, which regards facial sufficiency. Now, it's for that reason that Giordano and Chavez are distinguishable because they involve cases where a mistaken identification of the official was made in the order after the authorization had, in fact, occurred. In traits, the order identified the DOJ official by title only. It didn't specify the name, which I believe is required. But the accompanying application and affidavit did mention him by name. In our case, by contrast, there is no identification of a specific person, correct or incorrect, in the September and October application orders. In the August application, there is no mention by title or name in the affidavit and application or in the order at all. So what you want is a rule that you have to put it in the application itself, and that's really the end of the story. If it's not there, government loses. Well, I don't think it's what I want. I think it's what the language of the statute requires on a plain reading of it. We have two sections that require that that information be in the application and in the order, and we have Giordano telling us why, which is that the prior authorization by a politically responsible DOJ official is one of the core safeguards of this statutory scheme. There's also another subject saying that Judge Breyer didn't see the letter in October before he signed, that Judge Jensen found to the contrary, so that Judge Jensen is clearly in error on that issue. Is that what you're saying? Yes. Why is he clearly in error? There's lots of other evidence that would suggest that Judge Breyer did see it before. With respect to the October order, that's the time, the last of these orders that are in issue, where there were two orders that were issued. One was ordered at 8.30 in the morning, and then an almost identical order. It had the same language, but the pagination was different. It was issued an hour and a half later, at 10 o'clock in the morning. It is our contention that the 8.30 order was signed before the Department of Justice authorization was presented to the judge. The 8.30 order was filed the same day, October 27th, that it was signed by the judge. The 10 o'clock order was filed on October 29th, along with this somewhat mysterious order construing, which we have no record as to its basis. The two visits to Judge Breyer on that morning, one at around 8.30 or a little before, and one at around 10 or a little before, neatly fit Agent James' practice as he testified to it. His first visit to Chambers was to deliver a draft of the application. This was his practice. He testified to this in the Raymond case, too. His second visit is to sign his affidavit and submit the application, along with the AUSA, after Department of Justice authorization was received. If that practice was followed, then Judge Breyer signed the wiretap order at 8.30, before the DOJ authorization was received. That was the practice. But didn't Cole's office receive the authorization letter the day before? There's a faxed information that says he did. Yes, correct. And then Cole, the next day, goes over to the judge's chambers. So we have to assume that he didn't take the faxed letter that he got the day before and showed it to the judge. Is that what you're saying? Yes. It's not clear to me that Cole went at 8.30. It is clear to me that Agent James went at 8.30. It is clear to me that Cole went at 10. And the way Agent James testified to his practice at the time, the first of the regular two visits to the judge were to drop off a draft, and the second one, after the authorization was received by the AUSA, was to accompany the AUSA back to get a signature. It seems probable to me, under the fact that we have here, that what happened, and this is a real problem with that procedure that the Northern District AUSAs and DEA agents are using here. You're saying it's probable. That's what you think. That's your conclusion. But why is Judge Breyer clearly wrong, clearly in error, from the facts that he had? He has the same facts you have. He comes to a different determination. The issue isn't whether Judge Breyer was right or wrong. The issue is whether Judge Breyer had been presented with proof of the DOJ authorization. I misspoke. Judge Jensen. Judge Jensen, when he made his finding, he had all the facts that you said. He comes to the opposite conclusion. Why is he clearly in error? Because I don't think that the facts that were before him reasonably permitted him to draw that conclusion. And the Court will recall that there's a related issue here, and we were not permitted to cross-examine AUSA Cole, nor were we permitted to call Judge Breyer as witnesses. That disenabled us to present very material and critical evidence with respect to this that could have simply answered the question, so that Judge Jensen would not have to have decided this based on extremely circumstantial evidence. Let's say the 830 order is bad. Why doesn't the 10 o'clock order cure it? Because the wiretap was initiated before the 10 o'clock order. Was there anything intercepted between 830 and 10? Yes. I mean, you might be entitled to suppression of whatever that is between 830 and 10, but clearly anything after 10 would be okay. Well, no. If the enabling authorization for the wiretap is the 830 signature, and if that signature happened before the judge had received proof of DOJ approval, then the judge's order is invalid. And everything that was written about that was invalid. That's right. So the wiretap is bad from 830 to 10, but then at 10 o'clock you've got another order, which is okay. Why doesn't that cause the initiation of a new wiretap? Even if it happens to have been open before that, but everything that happens after 10 o'clock then becomes okay. We don't know what happened. Well, maybe between 830 and 10, because that's suppressed, whatever that is. Well, we don't know what happened at 10 o'clock either, because we weren't permitted to cross-examine AUSA code. I understand that you've got arguments about 10, but let's just deal with this. Assuming 10 is okay, 830 is not. Well, then I would concede that that may be a problem for us with respect to anything after 10 o'clock, except there's the related issue that if we are correct and the August application and order were bad, then the September and October applications are fruit of the poisonous tree, and they, in fact, would fall anyway, because they're all based on information that was gained subsequent and as a result of the original wiretap application. But the argument that the August is the weakest, because that one, there's actually a letter in the file showing the authorization. I would respectfully disagree. I think it's by far the strongest, and the reason is that we're not making a challenge there to the fact that there was prior DOJ approval. We're making an attempt there that the requirement that that be reflected on the face of the application and order was not complied with in any way, shape, or form. It wasn't incorporated in the application. It wasn't referred to. It wasn't a letter in the file that showed authorization. Yes. And the finding that the judge had access to the file, and would have seen it. No, I'm not conceding that at all. As a matter of fact, Judge Breyer believed that the person who authorized the application was a USA call. That's not the person in the letter. The person identified in the letter is a deputy. So he's wrong. What difference does it make? The judge didn't know. What difference does it make whether he knew, does he have to, is it something that the judge has to know who did the authorization? Absolutely, and that's what Raymond's about. The district court cannot default to law enforcement, its responsibilities with respect to these safeguards under the statute. The district court itself, and this is what Raymond says, the district court has the obligation of making sure that these safeguards are followed. And that's why it's required in the statute that the application tell the district court judge, this person, the identity of the person, the qualified DOJ person who has authorized, and must, in the order, indicate who that person was and make a finding. But the letter did tell him. Judge Breyer, in fact, didn't know. The letter did tell him. It's in the letter. The letter told the AUSA who received it, it didn't tell Judge Breyer because he never knew. It was in the letter. It was in the application where it was supposed to be. It was in the letter, right? Yes. And the letter's in the file? Yes. And you have no information that Judge Breyer didn't read the letter? Well, there's, I disagree. I think that there's very good evidence that he didn't. He named the wrong person in a report as the authorizing officer. So he didn't know who it was. That's the problem, is because it was left, and that's the whole problem here with the scheme that the Northern District U.S. Attorney is using to report. This was a report prepared later? In terms of the ministerial office? Yes. And this is who the judge believed was the person who gave authorization? Oh, no. That is whoever typed the report in his office put that in. Let me put that in the report. They may have said, well, I can't remember the person's name, and you check the file and pick up a name and put it in there. Well, there's no indication that he actually knew the name. There's indication that he didn't know the name, and we were not permitted to ask him. And we were not permitted to cross-examine the U.S. Attorney, whose declaration was accepted as direct evidence by the court about what happened. There's no precedent for having judges testify about what happened during boycott applications. There's no authority for this. There's no precedent. There is precedent that we've cited with respect to various types of search and seizure issues, and we had no intention of asking Judge Breyer about his thought processes in deciding to grant or deny the wiretap order. That was not what it was about. We were simply interested in certain factual questions. Did or did not this occur? For example, with the September 25th order, where the judge signed the order and then wrote in hand the notation 3 p.m. We know that the U.S. Attorney didn't receive notice of the DOJ approval for the application until 3.29, a half an hour later. But Judge Jensen said that was just a fact, just a clerical error. He just made a mistake. Right. Judges have been known to make mistakes as they're writing things down. Judge Jensen's finding, with all due respect, was clearly wrong. What he did is he invalidated a handwritten notation of the district court judge without any direct evidence that that was an error. As a matter of fact, we argued in detail that it was only the most inconclusive circumstantial evidence that he used to make that finding. He didn't give us an opportunity to ask the judge the question I wanted to ask. Your Honor, when that was presented to you and you signed the order and you wrote down 3 o'clock, did you look at your watch? That's a really important question to be asked here because neither the AUSA or the agent could specifically deny that. How do we know when the fax was received? If the fax stamp is on the document itself. The problem with fax stamps is they're wrong half the time. The AUSA went back and checked it. If your daylight savings time, the faxes don't reset themselves, and if your fax is set for standard time, half the year they're wrong. Unless you've got somebody who can figure out how to go in and change that, it doesn't change. Right. Absolutely right. And that was caught up. Isn't that the most likely explanation of what happened? It was checked out, and that's not when the fax happened. I'm sorry, I didn't hear you. That was checked out during the time this was litigated. The AUSA checked with the phone records at the Department of Justice to verify that the time on the fax was correct, and it was. So that was not a disputed issue. It's clear that that was received at 3.29. That's not a dispute. So if that is correct, then the AUSA would have had to receive the fax, grab it. The AUSA is in the same building as the district court, right? Yes. Okay, so grab the elevator up to the... Well, at that time, I believe that AUSA Coles was in the same Oakland courthouse as Judge Jensen. I'm not sure. He may have been in San Francisco, but it wouldn't have taken long for him to get there. We're talking about Judge Breyer, not Judge Jensen. I'm sorry. You're correct. And I can't tell you which courthouse AUSA Coles was in at the time. If we assume the time stamp on the fax is right, and you tell me that there's evidence of that, all that would have had to have been done by 4 o'clock when the clerk's office closed. Yes. Is that correct? Yes. So I'm trying to figure out, aside from the question of Judge Breyer's notation about the time, which maybe he said 3 o'clock and he really meant 3.49 or whatever time it would have been, between the time of receiving the fax and the time the thing was filed would have been 31 minutes. Yes. And do we have any evidence about what the logistics of that would have been? Who had to travel where? I don't recall that. As I recall, the elevators are not the best at 450 Golden Gate. The answer is there was no specific testimony that I can recall on that issue. I wanted to cross-examine AUSA Cole about this and ask questions of the judge, and I was not permitted to do so. So the only thing that we have is Cole's declaration on what happened. And I don't believe he discussed that at all. Well, we do have the two posts. We have the fax, you tell me, which was verified with a phone company. It's not just a timestamp on the machine. And we do know the clerk's office closes at 4? Is that correct? Yes. The clerk's office does close at 4. However, it doesn't mean that it was filed at the clerk's office because Judge Breyer's courtroom deputy can file matters also. I see. So the courtroom deputy, if he's in chambers, has a file stamp and he can-  And so the record doesn't factually show what happened with respect to that. And that's yet another area that we were just unable to explore by the judge not having a hearing. The file stamp shows a date but not a time. It shows a date and a time. The time is 329 p.m. No, I'm talking about the filing of the order. Oh. Do we have to do that? Mr. Finning is going to take a look and see if we're able to read. My recollection is that those stamps were pretty illegible on most of these orders. But we'll take a look as we're speaking to see if it's there. While he's looking at that, if I could, I would like to follow up with the related issue of the court- Can't tell. Yeah. In the excerpts of record, Your Honor, at page 353- Which order are we talking about? September 25th. September 25th. Yeah, I have it here. Yeah, it's 353. You can't tell from the stamp. It clearly shows the date and you can't tell the time. Original file, September 25th. We're actually reading, right? But there wouldn't be any place for a time. I believe some of the stamps that are used, the electronic ones, put the date and time. This appears to be one of the hand stamps from which one might infer there was a courtroom deputy because usually when I go file at the clerk's office, they use one of those time stamps. The electronic ones, they'll have the time and date. This appears to be a hand stamp that doesn't have a- Which makes it likely that what happened is that Judge Breyer signed the order- After it. After that time. Well, at whatever time he did, he then hands it to his courtroom deputy or he has secretary hand it to the courtroom deputy, or maybe the courtroom deputy is there with the order and the judge signs it and hands it back to him and the courtroom deputy then places the stamp, which he could have done at any time that day. Well, as Judge Breyer says, even the judge's secretary could do that. I think it's a reasonable inference that after the judge signed the order, he may have handed it to the secretary who then stamped the file. And that could have occurred within moments of his signing the order. But it also could have passed 4 o'clock. Yes. Okay. Are you pursuing your argument that Chino, they should have known who Chino was? Yes. And I think the best way for me to approach that is that for the court to accept the government's position that they didn't know who Chino was and the related question that they didn't know that Johnny Barnes was on the earlier Chino Durante's wiretap, this court would have to believe that the agents involved in that investigation were not aware of the contents of their own investigation. But isn't Chino a very common nickname in Mexico? And isn't it named? I travel a lot in Mexico. Yes. And it has nicknames down there, and Chino is a big one. Isn't that a very common nickname? Absolutely, yes. So how are the agents going to know several years later this Chino is the same Chino that was there a few years before? Because these agents have conducted over the exact time frame that we're talking about here a number of major narcotics investigations specifically in the East Bay area of San Francisco Bay. And there aren't lots and lots of Chinos who are major drug dealers who were the subject of wiretaps in the East Bay by these same law enforcement officers. That's what's so surprising here. Because this is not like we're talking about a Chino in a world full of Chinos. We're talking about the only other Chino that I'm aware of, and there aren't that many of these large wiretap cases, and I've been aware of most of them in this time frame. And that's why we were able to discern almost right away who Chino was. It so happened that myself and Mr. Finnegan were involved in that same case with another co-defendant, just like those law enforcement officers were. And it struck us right away, we know who they're talking about here, and all we had to do to verify that was go look at their pen registers, their trap and trace evidence, their toll records, and the actual calls that were intercepted that have Johnny Barnes' voice clearly identifiable on the intercepted calls. There's no great leap of faith and no tremendous amount of investigation that's required here. This is their investigation. Is this another one we have to determine whether Judge Jensen was clearly in there? Yes, and we think he was. Okay. You've got a tough call to hold. Three former trial judges here, or one current trial judge. And two former ones. The other thing that I did want to mention was our argument that Judge Jensen didn't give us an opportunity to have a hearing, or at least a full and fair hearing. And I think that's really important with respect to the facial insufficiency arguments and the two arguments that the September and October wiretaps were not legal because the judge didn't, in fact, receive notification and proof of DOJ authorization before he signed the orders. To resolve the disputed facts, what Judge Jensen did is he allowed the government to submit declarations from a number of witnesses, including a USA call and Agent James. He permitted to be called as a witness. His order, when he set the evidentiary hearing, specified that Agent James was to be the only live witness. And this was before he heard whatever evidence was to be adduced at the hearing and could make a decision based on that as to what was material evidence. So he made this initial determination that only Agent James could testify. Denied our request for a subpoena or a deposition. And the reason we asked for a deposition was just sort of a matter of comedy or respect to Judge Breyer. If in any way Judge Breyer might feel that it was not appropriate for him to be called as a witness in another judge's court, we certainly wanted to be deferential to that. So the reason that we... Did you send him a letter asking him? I did. And what did he respond? Well, I sent him a letter asking if he would be interviewed by myself and Mr. Finnegan regarding this, and he declined to be interviewed. After that, we then requested either a deposition or a little set in stone. To me, that's all the courtesy that you needed to show. I mean, you offered to interview him and... Well, we weren't trying to put... But I'm simply explaining why we made those requests in the alternative, because if the judge felt more comfortable in a deposition context, that was fine with us. It didn't matter. You know, we've got 21 minutes over, so why don't we hear from the court for a minute? Thank you, Your Honor. Do you want to save the rest of your time for rebuttal? Yes, please. Well, we just deducted from your next argument in this court. Good morning, Your Honors. May it please the Court. My name is Rebecca Hardy, and I represent the United States in this matter. First, let me say and address some issues that were raised by counsel. This is not a matter of first impression, as he represented to this Court. In fact, this Court's decision in Swann is right on point, and I think Your Honors alluded to it in your questioning about the function of the roles to be played by the identification requirements of the statute. And this Court in Swann noted the decision in Chavez and the language by the Supreme Court in Chavez and specifically noted that the identification requirements in the wiretap statute do not play a central role in the wiretap statute. Wait a minute. The Swann doesn't go very far. The Swann was a case where there was the authorization or the application made a small mistake in the title of the authorizing officer. Yes, Your Honor. It said acting assistant attorney general. Right, which the acting assistant attorney general, by law, is not empowered to authorize wiretaps. And therefore, it is facially deficient because since the person doesn't have the authority, setting forth that person's identity on the face of the order makes it insufficient with respect to the statute. However, this Court noted the inquiry doesn't stop there. You then do the second part of the inquiry, which is, okay, there's been a violation of a part of the statute. What role does that part of the statute play in Congress's intent to limit wiretapping? And with respect to stating and setting forth the identity of the authorizing Department of Justice official, the Chavez Court specifically said not only does it not play a central role, quite frankly, it doesn't even have a function within Congress's intent to limit wiretaps. What Chavez noted was what it appears to do is enable judges to do exactly what counsel was pointing out, which is complete the reporting requirement to the administrative office of the courts when judges are required to submit those reports to note when wiretaps have, in fact, taken place. What is most important in safeguarding against unwarranted wiretapping is that, in fact, prejudicial authorization has been obtained before you go to the judge. And in this case That's not what the statute says. The statute says it has to appear in the order, it has to appear in the application. And it's one thing to say, well, they had a small mistake, and it's another thing to say it's completely unmet. Your office is responsible for these things, and I can't for the life of me understand why you would have a series of these applications that don't comply. If it says it's in the face of the order, why don't you put it in the face of the order? Yes, Your Honor. I agree. The statute says it shall contain. And doesn't your office read the statute? Yes, Your Honor, it does. And I cannot stand up here and say that the paperwork submitted to Judge Breyer was drafted with the type of care and attention that it should have been, because clearly it was not. The question is But by allowing this to happen, we're just encouraging more sloppiness. What we need to do is to vacate these things, and the next time, AUSA won't be I mean, he didn't do it just once. He did it three or four times in a row. This seems to be a paradox. He did do it three or four times. I don't think the remedy here in order to punish the government is to suppress the evidence that was gathered. The major requirements set forth in Title III were met, and Judge Jensen found that they were met. How do we know that they were met? Pardon? How do we know they were met? Well, Judge Jensen couldn't find whether Judge Breyer actually read what was in the file. In no way of knowing. No, but what he did, what Judge Jensen did Judge Breyer was required to, and I'm confident did read the application. There's no requirement of tapping into the file. That's a pure guess. It is like using a Ouija board. Your Honor, what What makes, what evidence is in the record to support the finding that Judge Breyer read something that was not part of the application that happened to be in the file? Well, Your Honor, first of all, it was part of the application process. As Your Honor pointed out, the letters are in the file. No, no, but the statute does not say application process. It says in the application. Correct, Your Honor. Okay, the application is handed to the judge. Yes. And the judge has an obligation to read the application. And we can presume he did that. In fact, we can't even question it because that's part of his mental process, whether he read that application, which is his statutory duty to do. But look in the file? I mean, unless we have somebody who says, look, I was there, I handed the file, I remember he actually read the letter, that's a fact. Saying he must have read it is a supposition. It's a guess. It's nothing but somebody's dream. Well, the government doesn't have to show in this proceeding for this court. The government has to show that it complies with the law. That's exactly right. It does not comply with the law. So now you're saying, well, the second best thing is there was this letter in the file, which we are guessing the judge must have read it. No, Your Honor, I'm saying that we complied with the law with respect to prejudicial authorization. And that is a very direct, that is a portion of the statute. It's not in the order. Pardon? It's not in the order. That we complied with that portion of the law? It's not in the application. It's not in the order. The authorizing official is supposed to be named in both places. That's correct, Your Honor. I assume the judge didn't draft this order from scratch. I assume that the order was presented by your office. That's correct, Your Honor. With respect to the August, there is no mention of an authorization in the order. In September and October, it's different. There is a reference. I understand the difference. In August, what we have is two documents that are required to show the authorizing official don't have it. It's not there. They're prepared by your office, and it's not there. And what we have is a finding by this judge, who is in a different courthouse, who has no evidence as to what the judge actually saw or read, that it's a finding that says, oh, he read this other letter. What evidence is there to support he read this other letter? The evidence to support that are several. First of all, the order existed. It was in the file. Secondly, excuse me, the letter existed. It was in the file. You could apply that to everything that's written in the world, and you can make the finding Judge Breyer must have read the book of Zen because it's written somewhere. So what? Secondly, you have the declaration of the assistant U.S. attorney who met with Judge Breyer in the presence of the agent and presented him with the documents. Thirdly, you have the- I'm sorry. What did the agent say? The assistant U.S. attorney? Yes. What he said was that he had done a number of wiretaps for this one. It was his common practice to wait until he obtained written authorization from OEO before he proceeded to meet with the judge to get the order signed, that it was his custom and practice to attach the written authorization letter to his paperwork when he went to meet with the judge. So he doesn't even say he did it in this case.  That's correct. There's no staple. There's nothing that actually finds in the file attached to it. We find a loose letter in the file that has no attachment. So insofar as Mr. Cole says this is my practice, we know he didn't follow his practice because attaching means you put a hole through it, you put a staple on it. But, Your Honor, I don't think the evidence shows that. The court filed- The evidence does not show is what actually happened in this case. Your attorney says it was his practice. Does he say anything about what actually happened in this case? Does he say, I was there, I saw Judge Breyer read the letter, authorization letter? Does he say anything like that? No. Is there anything from the courtroom deputy that says that he read the letter? Is there anything from Judge Breyer saying he read the letter? No. How do we know he read the letter? Your Honor, based on the evidence that was presented to Judge Jensen- How do we know he read the letter? By inference of the facts as they were presented to Judge Jensen is as he found. He had the declaration of the AUSA and he had the testimony of the agent who said he received a call from the assistant that he had received- Does any of the evidence prove anything more than the letter was available and could have been read by Judge Breyer? No, Your Honor. Okay. So how do we know he read it? Because Judge Breyer issued the order. We can presume that he read it, that he followed the statute. We can presume that Judge Breyer wouldn't sign an order that didn't comply with the law, and yet we know he did. We know that the order, the law requires the order to contain the name of the authorizing agent in it, and yet Judge Breyer didn't. So we already know that he did not comply with the statute. Okay. So now we're in the field of trying to figure out whether, despite the fact that we know he committed a violation of the law, that he did not comply with the statute, he must have done something else that's almost as good. And the fact is you have no evidence. We have Judge Jensen guessing. Your Honor, if I may just address the fact of the violation, that it's not contained in the order, the identification is not in the order, in the August order. The question then is, is that a violation that warrants suppression in this case? That's a different question. Your Honor, what we do know, you're saying, oh, Judge Jensen, Judge Breyer must have read it because he wouldn't have done something if he was illegal. Whether it merits suppression or not, we know he was not supposed to sign an order that didn't contain the authorization. You and I agree on that, right? Yes, we do. Nevertheless, we know he did. He did it. He signed it, even though the law says he shouldn't. Yes. Okay. I know Judge Breyer. I know he must have done it in good faith. He's a wonderful judge and a wonderful person. He wouldn't have known he'd done that. But we do know judges make mistakes. And what we know is that this judge in this case made a mistake. So telling me we know he must have read it because he must have complied with the law just doesn't cut any ice. Let me ask you this. How was this presented to him again? The application and the order and the written authorization, as the evidence was developed before Judge Jensen, AUSA Cole waited in his office to get written authorization from the Department of Justice. I mean, when they came to Judge Breyer's office. Yes. Who was there? It was AUSA Cole and Special Agent James. Yes. Okay. Were they in with the judge in his personal office? Were they waiting in the auditorium? No, they were in chambers and they met with Judge Breyer. And Agent James testified that he watched Judge Breyer peruse the documents, read through the documents that he was given. Did he say that he read the letter that he saw Judge Breyer? He saw him read the documents. He didn't stand over him. He doesn't even say that he had passed the letter in this case. No. He said this is his practice. Yes. He doesn't even say that in this case he remembers presenting the letter. That is correct. So how can he remember that the judge read it? He is not the one who said that the judge read it. The judge wasn't making it up. That's a simple fact. He wasn't making it up. What were the papers that were brought in by the ASUSA and the agent? Your Honor, I'd have to refer to the exact excerpts. I believe it was somewhere around 60 pages or so between the affidavit, the application, and the order. And they may or may not have included the authorization letter. No, Your Honor. So far as the record shows, there's no evidence that it did include an authorization letter. No, I disagree with that. Okay. Show me the evidence. The evidence is that it was received the day before by AUSA Cole. Okay. And it was AUSA Cole's practice to include that with those documents. So how does that prove that, in fact, he complied with that practice on that day? It didn't mysteriously appear in the court file. It's in the court file. The only way it gets to the court file is if it's filed with the court. So he hasn't had a letter with him for it to be like this. Contemporaneously? Yes. I don't know how he would get into a court file. Is it stamped? No. It doesn't have a separate document stamp, which indicates that it was stapled to another document. Were there holes in it? Yes. There are holes in it. And if you actually look at the district court file, these documents that were contained in that file, which have now been unsealed and are available to the public, have been stapled and unstapled many, many times. The file is in complete disarray. But it does not have a document stamp, which indicates it was not filed separately, that it was attached to something when it was filed in the court file. And what was the date of that? The date that that order was signed, Your Honor. The letter? The letter was dated the 25th, and the actual order was issued and signed on the 26th. Pretty thin. Pretty sloppy work when you were part of your office. Your Honor, the paperwork in this case should have been drafted with more care, there's no doubt. And I would not stand up here and argue about it. Well, how is your office going to learn a lesson? Well, Your Honor, it's already learned a tremendous lesson from this case in having litigated in front of Judge Jensen. It was litigated for months and months in front of Judge Jensen. And now the practice with respect to these is very different than it was. The individual's name is placed in the application. The office has actually complied with the law? Yes, Your Honor. Okay, that's always reassuring to hear about the U.S. Appellate Office. Yes, we are. How long were the hearings in front of Judge Jensen where he made these factual determinations? There was testimony taken, and as I recall, there was at least two hours of argument and review of the records, and it occurred over several days. Let's talk about the order, the September order, the September application. This is the one where the facts comes in half an hour after Judge Breyer says he signed the... Judge Jensen said this must have been a, or this was a clerical error on the part of Judge Breyer. Yes. What evidence is there for that? He based that finding on, again, the declaration of Mr. Cole. Okay, and what did Mr. Cole say? Mr. Cole was now trying to save his bait in the most furious way? Well, I suppose that's one way of putting it, Your Honor. Anyway, what exactly did he say? I mean, if AUSA Cole really wanted to save his bait, and he would have stated, I waited on that bait, and I didn't go until I received it. But instead, he was certain about it. Two years down the road... There are limits to what you can say. I mean, two years down the road... What did he actually say? He said it was his custom and practice to wait, that he did not go to... But he doesn't say he waited in that case, right? He doesn't point to the statistics. Okay, so we have a fax record, backed up by telephone records, that the thing comes in at 3.30 or 3.29, and we have Judge Breyer's location, who we know does not, you know, And then... How does Judge Johnson manage to reconcile these things again? We have the testimony of the special agent, that he received the call from Mr. Cole, that he had obtained the written authorization, that he had set up an appointment to meet with the judge. They walked the chambers together. Mr. Cole told him that he had the letter with him as they walked the chambers. The special agent testified that when they went into chambers, Mr. Cole provided the judge with the documents. He saw Judge Breyer review the documents before he signed them. And again, if you look at that authorization... Is this Cole or is this the agent? This is the agent. And if you look at the documents that's contained within the court file, once again, it does not have a separate document stamp number on it. And if it were filed separately, it would have a stamp on that. And there's no dispute that it is contained in the court file. Were all these same discussions that we're having right now made to Judge Johnson? Yes, Your Honor, they were. And after he heard these several hours or weeks or whatever it was of testimony, he made a finding that he's understanding the facts for this? Yeah, he did, Your Honor. And you're claiming that's not clearly in there? I am. If there are two reasonable interpretations, that is not... If there is, in fact, evidence supporting the finding. There's no evidence supporting the August finding at all. But as for this one, I'm trying to figure out what is the evidence supporting the finding that Judge Bleier put down the wrong time. Doesn't Cole say that he believed that he followed his practice? Yes, he did. He didn't say, I know absolutely I did because it was a couple of years ago, but I believe I did. That's correct. So that's the evidence that was before Judge Johnson. That and the testimony of the special agent that Mr. Cole told him as they were walking to chambers that he had the letter with him. And again, I point to the document itself. The agent doesn't say he saw the letter? No, he said Mr. Cole told him that he had it and they're on their way. It was faxed to Mr. Cole's office. The agent had been waiting for the phone call in the wire room. They were anticipating it. He waited for the call. Let me ask you this. When the two of them showed up at the judge's office, had an appointment, what did they say to the judge? Your Honor, I was not present, so I can't say. As for my own knowledge, all I can point the court to is the record, and according to Judge Aracutia. Did they say something like this as far as the record is concerned? Oh, we've got this document. It's an authorization for a wiretap. This is a very critical matter. We've got to get going on it. We're all set to go tonight. And this is extremely important. And was there anything like that said? If there was, Your Honor, that was not developed in the record below. We don't have anything to that effect. There was some discussion, according to the agent, about Judge Breyer, curious about what sort of developments had transpired from the first order that had been issued, what sort of evidence had been gathered, and just generally talking about the investigation. But there is no specifics with respect to that. Well, which brings us to Judge Breyer. Why wasn't there an abuse of discretion for Judge Jensen to refuse to— I mean, given how fact-specific these issues are and how central Judge Breyer was to all of these facts, not in his thinking process, but in what papers he received, what papers he read, whether things were present, whether when he wrote down the timestamp, whether he checked his watch or how he came to writing down what has now been found to be a wrong time, why didn't Judge Jensen abuse his discretion by denying defendants an opportunity to either question or depose or subpoena Judge Breyer to testify? Well, Your Honor, Judge Jensen felt he had sufficient facts before him  But that's really not the test. The test is whether or not defendants have a fair opportunity to contest and to present evidence. And the judge may feel he has enough facts, in fact, so if he had more evidence, it makes the job harder because you then have to resolve conflicts. So the fact that the judge is satisfied he has enough facts doesn't mean that defendants have been given a fair opportunity to present the facts that favor them, that might be helpful to them. And I don't understand where Judge Jensen gets the authority to withhold the subpoena from such a key witness. There's no prohibition in having judges testify as to facts as opposed to mental processes, right? Well, that's true, Your Honor. There is no limitation. We certainly know a lot more about what actually happened if Judge Breyer were to give us his evidence on this point. Maybe, maybe not. I mean, again, these motions were filed two years later, and as you can see from AUSA Cole's declaration, he was very careful. He didn't want to state something that he himself felt he could not state. It would have been easier had he stated, I remember that day, I remember I got it, I remember I got it at this time. And that would have been easy, but he was honest about it. And it was conjecture, according to Judge Jensen on the defendant's part, to think that bringing Breyer in two years after the fact to testify about who signed the letter and what time was it that he noted on the order, was it the correct time, he felt that that would add little and there wasn't enough showing that Breyer could add anything to the record that wasn't already in front of him. I mean, if Judge Breyer wasn't the judge, would there be any doubt as a recipient with this if the defendants wanted to, you know, for example, let's say this were the agent, and let's say the agent had not provided any evidence, and the defendants believe that the agent may provide evidence that's favorable to defense. Is there any doubt that the agent would be required to give testimony as to where he was, what he did, what evidence he showed? Well, certainly if it can be shown that it was favorable, I think they'd absolutely be inclined to do that. Well, they don't know whether it was favorable or not. We know for a fact that Judge Breyer said 3 p.m., which is highly favorable to the defendants. We know that he actually marked on a legal document 3 p.m., something that he was required to do by law and that was part of his duty. So we know that much, at least in one respect, Judge Breyer might have something useful to say for the defense. But for the fact that he's a judge, is there any doubt that he would have been required to testify? Your Honor, perhaps not. I don't know. So is there anything special about being a judge? I mean, aside again from the fact that you can't delve into the thinking processes, is there any justification for saying just, you know, that a judge can? The thing was denying him the opportunity to cross-examine Mr. Cole. Judge Jensen felt he had sufficient information before him that actually questioning these people 2 years after the fact would add little to what was already in the record. How could he make that determination before the hearing? I don't think he made that determination before the hearing. We had the hearing, we had the arguments, and the agent testified, and it wasn't until after that he actually took that issue under submission that he denied the request. Counsel argued, and I'm not sure what the record shows, that that was some sort of order that came out before that they wouldn't allow any testimony except from the agent. And it was before the hearing, so how can he make that determination before he's heard what's going to happen? As I recall the record, and I'm sure counsel will correct me if I am incorrect, but as I recall it, what the judge said is, I will hear from the agent at this hearing. He did not at that point deny the request to depose the judge. And it wasn't until Judge Jensen issued his written order in February, several months later, that in that order he actually denied the request and found that he didn't need the testimony. It hadn't been denied prior to the hearing and the testimony. Let me just ask you this. When the assistant U.S. attorney and the agent, they came in and sat right in Judge Breyer's chambers, they had about 60 pages. How long were they in there? The agent testified that it was somewhere around 15 minutes. And, of course, in each of these instances there is testimony and evidence in the record that Judge Breyer had been provided with courtesy copies of all the documents in advance. So, other than the written authorization, obviously, because that had not come in. He had all this in advance? He had the affidavits, the applications in advance, as I understand the record is it was developed alone. So, same thing. I never encountered that. They usually come in and there's a crisis. And it's got to be done now. And here it is. And we'll wait outside. Your Honor, that was not the evidence that was presented to the court or the situation that existed in this particular case. The first application and order had been submitted to... So he had everything in advance? He did have everything in advance. Okay. Now, how long after that was signed was the first wire tap conducted? The very first one in August was signed on the 26th. And that was for the bug in the office. And interception did not begin until September 1st. Then the second application and order sought interception of wire communications over telephones. And that, because it was an initial application and order, it wasn't until one was expiring and they were about to get up to continue intercepting in that case. And then the third application sought both wire interception as well as oral interception back into the office. Is the defense counsel right when he says that if the first one falls, everything falls because the second and third were fruits? No, I don't think that can be said with respect to the oral bug because at the same time, something that has not been challenged before this court, and I mentioned it very briefly in the brief, is that there was also an application and order granted to install a video camera inside the office. So there was videotaping going on in the activities inside the office. So I think if this court were to reverse Judge Jensen and suppress, it would have to be remanded for further review as to what survives. So I don't think that's true in this particular case. And, again, I understand the defects and the problems, but in looking at this court's decision in Swan, and Swan cited several other decisions, which Judge Jensen also cited, which is Aikon in the Third Circuit, and Trait, by the way, which also stated that setting forth a title is sufficient. You don't have to actually state the name. Also, this court cited Robertson in the Fifth Circuit and Erdmann in the Sixth Circuit. All of those decisions have held that the identity requirements of the statute, although mandatory, and certainly failure to do so, is a violation of that provision. It's not a violation that warrants suppression. Was the assistant aware of these cases when he filled out this paperwork? Your Honor, I don't know what Mr. Cole was or was not aware of. A minor facial insufficiency. This does not substantially impair the accomplishment of Congress's purpose. Correct. Well, leaving it out altogether is not a minor. It's one thing to sort of get it there and get the name slightly wrong or the title slightly wrong. It's another thing to just ignore the requirements altogether, just not to put it in there. Your Honor, the purpose, as counsel has stated, is to fix responsibility. So putting the wrong name in certainly does nothing to fix responsibility, particularly if you put in the name of an official who is not even authorized to authorize a wiretap. So you have to look beyond that, behind it, to see whether or not the precondition, really one of the most fundamental requirements of Title III, is whether or not they sought and obtained proper authorization from an individual who is politically responsive. And in this case, there's no dispute that that, in fact, occurred. And those letters are in the court file. The defendant, in a case in the Tenth Circuit, Radcliffe, dealt with this issue. The defendant was certainly not prejudiced. His responsibility was set. He has the letters. He knows exactly who authorized these wiretaps back in Washington. Didn't Radcliffe rely on Swann as a part of his decision? It did, Your Honor. It relied on Swann and the other decisions that I've mentioned before this Court that this Court relied on, and also that Judge Jensen mentioned in his orders as well. I see I'm way over my time. I haven't addressed the other issues. Does the Court have any other questions? Well, if you also had done it right in the first place, we'd never be wasting all this time, would we? You're exactly right, Your Honor. Yeah, but there is a laxity going on. I see it. And it's all got to do with harmless error, you know. Do what you want. Hold back what you've got to turn over. Your Honor. Put on questionable witnesses. It doesn't matter because they're guilty as hell anyway, so it's harmless. Your Honor, I don't believe that. Do you have an attitude that pervades these days? Well, I can only speak for myself and my colleagues, and I don't believe that that is an attitude that pervades. But why is something important as this? You know, you'd think that the person would sit down or look at the statute and say, yeah, this is required, this is required, I'm going to make sure I get it all in. But they just, you know, go off. It was careless drafting, but he did the right thing in getting... Who supervises these things? Do lawyers just draft these things and they don't, you know, is something as important as a YFAP authorization? Well, Your Honor, I can say this in this particular case, the procedure has greatly changed in our office. We now have a shared directory which contains the proper formatting that should be used in these cases to make sure that these sorts of statutory requirements are complied with. It's very important. But isn't something, you know, you get all these manuals from Washington, from the Justice Department, you never got one on wiretaps? Well, Your Honor, I don't know what Mr. Cole, again, what he had or didn't have. I do know that he did comply with the most fundamental requirement of getting pre-judicial authorization, and that in all other respects, his application and the order were in compliance with the statute. And I'll just very briefly, unless there are more questions on that issue, I'd like to address just very quickly, I know I'm over my time, the issue of Chino and the prior applications and whether or not Chino should have been named in this particular case. How many Chino drug dealers are there in Oakland? Your Honor, I don't know with respect to Oakland alone, although in the East Bay, as Judge Jensen found, we provided Judge Jensen with a printout of the Natus reports that DEA used and relied on in their investigation, and there were over 250 Chinos in Northern California. The names alone covered 22 pages. The information relating to those Chinos covered 750 pages, and Judge Jensen specifically noted in his order, having reviewed the data provided by the government, he was even more assured that the steps the government took to investigate prior applications was reasonable in this particular case. And that's a quote out of his order, he himself having reviewed this information in a unique position to determine whether or not those steps were reasonable. You know, I was born in East Los Angeles, and I've lived in L.A. all my life. I never met a Chino. And I... I... You know what Chino means? Yes. I don't know what Chino means. I'm not telling. I will say I ran a PACER search yesterday for the Northern District of California using the name Chino, and it popped up several cases, including a couple in which Mr. Rosenbusch is counseling, so it does appear to be a common nickname. But I think Chino means Chinese. Right. Thank you. Well, thank you very much, Your Honors. All right. Your Honors, could I briefly take a little time to get to future... Yeah, you're so appealing, how can I say no? I'll try to be really brief. You've been more than patient with us both. First, I wanted to point out that Judge Jensen did, before the hearing, order only that Agent James was to be a witness, and since I believe that was disputed, that's found in the excerpts of the record at page 750. The judge's order of December 1, 2000, specifically finds that an evidentiary hearing would be helpful to the disposition of the motion, hereby sets the hearing for December 28, 2000 at 10 o'clock. The witness to be examined at this hearing is Agent James, was the language of the order. With respect to the... Had you requested to examine Cole? Yeah, and we asked for the issuance of subpoenas. But Cole and Fedez-Reyes? Yeah. My recollection, and Mr. Finnegan's is the same, is that during the argument, we requested specifically that Judge Jensen permit us to cross-examine Cole about the declaration that he had already submitted, and that was denied. So what about Judge Breyer? We specifically requested a Rule 17 subpoena, and that was denied. Counsel for the government says that that was not denied after the hearing. But what you're saying is there was no order granting it before the hearing. Was it an outside denial, or was it simply... Yeah, there was a written motion for the deposition that was denied. It is my recollection, and we'd have to check back in the records, that that all occurred before the hearing. We clearly asked to have Judge Breyer be available. And Judge Jensen's order in response was that Agent James was to be the only witness at the hearing. With respect to the government's argument that the remedy shouldn't be suppression, I very much agree, and emphatically believe that it should. That's a statutory remedy. This is not a judicially-created statutory remedy. Congress created this remedy specifically for this situation. I think the government's argument that they've already learned their lesson and now they're doing it all differently is completely unpersuasive. Does that work both ways? Does a criminal defendant who violates the law and goes through a criminal proceeding get to say to the judge at the end, look, I've gone through this whole proceeding, I've had to come to court, I've learned my lesson, you shouldn't punish me. No, that's not the way the law works. It's not the way the law works with respect to criminal penalties when you commit a crime. It's not the way the law works with respect to exclusionary penalties, which here, Congress decided, are the appropriate penalties. And that's really important because of the nature of this kind of surveillance. So I do think that suppression is a statutory and very appropriate remedy here. The sloppiness issue, which this really goes to, is dramatized by the procedures that were used here. When the AUSA and the DEA agent come back a second time with their approval letter in hand, their authorization letter from DOJ, the testimony was clear that they were then with the judge for 15 or 20 minutes. The judge couldn't possibly read a wiretap application in 15 or 20 minutes. It takes hours to read them. They're really long. There's a lot of stuff that's in them. Clearly what they did was they came in ahead of time. I don't understand what the big rush is. Why not just do it the next day? Why do you have to give the judge, in violation of the statutes, the application before you have approval? Instead of get your approval, give them the application, come back the next day. These wiretaps last for three months. You never get the critical smoking gun on the first day. What is the big rush? It creates a situation that sets judges up for error. It has happened to Judge Henderson and Reyna, and I believe to Judge Breyer here. It creates a situation where the judge can't do what he's statutorily required to do, which is read the application that the AUSA comes back with the second time. Not take the AUSA and the DEA agent's word that it's the same as the draft that they gave him initially. He's supposed to read it. When I am doing a plea agreement, do we have copies of those drafts in the file? Not that I'm aware of. Would it be part of the record? Not that I'm aware of. I believe only the... Could be in the district court record. Probably not, because they deliver them to the judge in Chambers. It's a draft, and so the judge sees them and... Yeah. Do we know that they're the same as the final? They put another stamp on it that says lodged. Those are not in the miscellaneous file where these orders are initially sealed and later were unsealed. They're not there. So this really bad practice creates a situation where the judge can't even read the application, which he's statutorily required to do. He's got to rely on the AUSA telling him, I'm sorry, judge, it's the same thing. And that's what Rina said. No, you can't delegate that responsibility in a very important investigation like this, this kind of intrusive surveillance to the law enforcement agents who are requesting the order. The judge has got to do it. And the way that their procedure was to make it impossible for the judge to do it. So I think suppression is a very appropriate remedy and simply saying, well, we've learned our lesson. Well, it's not impossible. The judge could say, I'm not going to read the draft. You come with an application and everything in proper order. That's true. He didn't. And don't bother waiting outside. When I'm ready to sign it, I will sign it and file it. And you will find out when the clerk calls you and tells you there's a filed order. Of course you're right. The judge is free to do that. Yes. But it creates a situation where that hasn't routinely happened. Instead... This is the practice in the courthouse here? That was Agent James' declaration and testimony that this was his standard practice at the time, and Cole said the same thing. The... Well, they're there, too, to answer any questions. I'm sorry, I didn't understand. They're there, as well, to answer questions. Yes, they are. They could be called if the judge has questions. Are they sworn, by the way? I don't know. I wasn't there. There's no transcript that I'm aware of. The only record is whatever the judge takes from the agent. So you have these little conversations. Yes. We don't know what happened. There is no record. This is San Francisco? Yes. And this is why the only way we could find out is by calling witnesses who were there to ask them what happened. First off, do you know him or something? Well, I don't keep records on that, I suppose. I'll take tape, too. All right. What else you got? With respect to the government's argument that the September and October orders identify the authorizing official, they don't, really. Even there, it was incredibly sloppy. What those orders say is that law enforcement officers are authorized to intercept the wire and electronic communications as authorized by the Assistant Attorney General in charge of the criminal division, pursuant to the power vested in the Attorney General by Section 2516.11b of Title 18 U.S.C. First of all, no person is identified as required by statute. Second, it wasn't an Assistant Attorney General. It was a Deputy Assistant Attorney General. Third, there is no Section 2516.11b at all. It doesn't exist. And the language here doesn't say that the application was authorized. The language here says that the wire tap, the intercept, was authorized, which, as the Assistant Attorney General can't do, the judge can't. Let me ask you a question. When did you get all these papers on the wire taps? After the indictment was filed, one of the things that we did was, and I can't remember the exact date, this was too long ago, but at some point the documents were unsealed and we were either given them by the U.S. Attorney or we go down and look ourselves in the miscellaneous file that contains the documents. Was that before or after the trial started? They were available to you. I'm sorry. Were they available to you before the trial started? This was a plea bargain case. There was no trial. Oh, this was a plea bargain case. Yeah, so they were made available to us prior to trial. They're sealed and not available until after the indictment is filed and the defendants are brought before the court. And it's at some point thereafter that either the AUSA gives them to us as part of discovery or we go down, look in the miscellaneous file and copy whatever we weren't given by the U.S. Attorney. You're not suggesting that because the U.S. Attorney was sloppy in their work that that's the basis for your argument. It has to be whatever they did would be in violation of the law. Is that right? No, I'm simply pointing out that what they did was very sloppy. It violated the statute of limitations. There are a lot of sloppy things that happen in the world, but that doesn't require suppression, correct?  How do you get around SWAN? You haven't talked about SWAN at all. It was decided by Judge Browning back in 1976, something like that. Well, that's one of those cases where I talked before about the government running two separate questions together. SWAN was one of those cases, one of these mistaken identity cases, where you're talking about whether or not the wiretap was illegal because the person wasn't identified. Here we're not talking ultimately about whether there were authorization letters from DOJ. We agree, there were. We concede that. We're talking about the facial requirement, facial insufficiency requirement here. SWAN doesn't address that any more than Giordano or Chavez or Traits do. That's the distinction there. That's why you say this is a case of first impression. Absolutely. It does not address the issue before your honors at all. With respect to the argument that was made when your honors were questioning the government about why shouldn't Judge Breyer have been called as a witness, the government made the argument, oh, well, it was all two years ago, he probably wouldn't have recalled. Well, Judge Jensen decided the matter based on Cole's declaration, which was two years old. So if he's going to rely on and make factual determinations on circumstantial evidence, which is two years old, why not get some direct evidence from a judge who was there, which is also two years old? On a disputed factual issue, I believe that was clearly the appropriate thing to do. In terms of responding to a question that was asked earlier regarding the timing of the faxes from Washington, those are addressed, and this is just to let the Court know, in the excerpts of record at pages 647, I'm sorry, 674 to 675. And the only other thing I wanted to mention was that the purpose for identifying the responsible individual is not, and this is what is discussed both in the congressional record and in the cases, Giordano and the following cases, is not only to affix responsibility in a particular politically responsible official, but also to assure the public that the finding has been made. That's the second and equally important objective. And those are the only other comments I wanted to make. Thank you. All right. Matter will stand submitted. Okay. Okay. Now we come to U.S. versus Moises Ecahiel. Great discussion. It was an interesting discussion. Yeah.
judges: Pregerson, Kozinski, Rhoades